UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

RICHARD E. STORY,

                Plaintiff,

v.                                               Case No.  5:04-cv-497-Oc-10GRJ

JO ANNE B. BARNHART, Commissioner of
Social Security,

                Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 6) and both parties have filed briefs outlining their respective positions.  (Docs. 18 & 20.)  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

On January 28, 2002, Plaintiff filed an application for a period of disability and disability insurance benefits claiming a disability onset date of December 13, 1999. (R. 303-05.)[1]  Plaintiff's application was denied initially (R. 309-11), and upon reconsideration. (R. 306-07A.)  Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner, and requested a hearing before an

---

[1] According to the ALJ's Decision, Plaintiff previously filed an application on April 10, 2001 alleging disability as of December 13, 1999.  (R. 11.)  Plaintiff was denied initially in July 2001 and did not request review of the determination. (R.11.)  Accordingly, this previous application is not at issue here.

Administrative Law Judge ("ALJ").  (R. 58.)  The ALJ conducted Plaintiff's administrative

hearing on April 11, 2003. (R. 22-51.)   The ALJ issued a decision unfavorable to

Plaintiff on May 28, 2003 (R. 11-21.)  The Appeals Council denied Plaintiff's request for

review on September 15, 2004.  (R. 2-5.)[2]  On November 8, 2004, Plaintiff filed the

instant appeal to this Court. (Doc. 1.)  On February 9, 2005, the case was remanded

pursuant to sentence six of 42 U.S.C. §405(g) because the administrative record was

incomplete.  (Doc. 5.)  On May 13, 2005 the case was reopened. (Doc. 8.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[4]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.[5] The district court must view the evidence as a whole, taking

---

[2] The Appeals Council received additional evidence that was not before the ALJ.  (R. 5.)

[3] See 42 U.S.C. § 405(g).

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[11] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does

_____

[6] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

not have a severe impairment and is not disabled.[12] Third, if a claimant's impairments

meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

disabled.[13] Fourth, if a claimant's impairments do not prevent her from doing past

relevant work, she is not disabled.[14] Fifth, if a claimant's impairments (considering her

RFC, age, education, and past work) prevent her from doing other work that exists in

the national economy, then she is disabled.[15]

     The burden of proof regarding the plaintiff's inability to perform past relevant work

initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to

demonstrate that "other work" which the claimant can perform currently exists in the

national economy.[17] The Commissioner may satisfy this burden by pointing to the grids

for a conclusive determination that a claimant is disabled or not disabled.[18]

     However, the ALJ should not exclusively rely on the grids when the claimant has

a non-exertional impairment which significantly limits his or her basic work skills or when

---

[12] 20 C.F.R. § 404.1520(c).

[13] 20 C.F.R. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[17] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (internal citations omitted).

[18] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

the claimant cannot perform a full range of employment at the appropriate level of exertion.[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[22] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[23]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born on September 25, 1951 and was fifty-one (51) years old at the time of the hearing.  (R. 29.)  Plaintiff completed the eighth grade and has a limited ability to read and write English. (R. 31.)  Plaintiff has past relevant work as a truck driver.  (R. 65.)  Plaintiff contends that he has been unable to work since December 13, 2001 due to a low back injury and pain. (R. 75).

---

[19] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[20] Walker at 1003.

[21] Wolfe at 1077-78.

[22] See id.

[23] See Doughty at 1278 n.2.

On August 1, 2000, Plaintiff was referred to Alan J. Appley, M.D. for lumbar disc disease.  (R. 167-68.)  Plaintiff reported that on November 22, 1999 he was injured on the job while picking up a pallet.  (R. 168.)  In reviewing Plaintiff's history, Dr. Appley noted that a MRI on January 4, 2000 showed a left L4-5 disc herniation in the foramen far laterally and subligamentous L5-S1 disc herniation centrally and a CT scan on May 28, 2000 showed central disc hernation.  (*Id.*)  Plaintiff's main complaint was low back pain with radiation into both legs with paresthesias in his legs.  (Id.)  On physical examination, Dr. Appley noted some moderate lumbar paraspinous tenderness and spasm and bilateral (right greater than left) sciatic notch tenderness.  (Id.)  Dr. Appley further noted that Plaintiff's gait was antalgic and that he had good strength throughout on individual muscle testing.  (Id.)  Plaintiff refused to heel or toe walk because of pain radiating down his legs.  (Id.)  Plaintiff complained of diffuse decreased sensation to pin prick in the feet.  (Id.) Dr. Appley's impression was lumbar disc herniation. (Id.)

On August 21, 2000, Plaintiff had a follow-up MRI.  (R. 165.)  Dr. Appley noted that the MRI showed left foraminal disc herniation at L4-5 with probable L4 nerve root impingement and central disc herniation at L5-S1 with potential irritation of S2 nerve root.  (R. 166.)  At Dr. Appley's recommendation, Plaintiff underwent left L5-S1 microdiscectomy[24] on December 18, 2000.  (R. 148-49, 154-57, 166.)

On January 9, 2001, Plaintiff had a follow-up appointment with Dr. Appley.  (R. 142.)  Dr. Appley noted that Plaintiff had essentially no relief of his leg pain from the

---

[24] A surgical procedure performed with the aid of a microscope, in which part or all of an intervertebral disk is removed.  Part of a vertebra must also be removed to allow removal of the disk fragments.  See 4-M Attorneys' Dictionary of Medicine 4273.

surgery and that Plaintiff reported severe leg pain and numbness and severe back pain. Dr. Appley noted that the neurologic examination was unremarkable but that the motor examination was significantly pain modified. (*Id.*)   Dr. Appley referred Plaintiff to pain management and ordered a lumbar myelogram/CT to determine if any further surgery was indicated. (*Id.*)

On February 15, 2001, Dr. Appley noted that Plaintiff reported persistent back and leg pain "which is out of proportion to what we find on his imaging studies." (R. 139.)   Dr. Appley further noted that Plaintiff's February 5, 2001 lumbar myelogram/CT showed some potential left L4-5 neural foraminal stenosis with potential irritation of the left L4 nerve root and a small central disc herniation at L5/S1.  (*Id.*)   Dr. Appley stated that he was at a loss to explain the severity of Plaintiff's pain and to recommend a surgical course of treatment.  (*Id.*)   He noted that Plaintiff was not showing evidence of any focal left-sided radiculopathy that would go along with his imaging studies.  (*Id.*)  Dr. Appley concluded that Plaintiff would have to be managed non-operatively. (*Id.*)

On May 8, 2001, G. Grady McBride, M.D., an orthopaedic surgeon, evaluated Plaintiff for back and bilateral leg pain.  (R. 249-53.)  Plaintiff reported progressively worsening lower back pain with radiation of pain into the bilateral lower extremities with numbness, tingling, and weakness.  (R. 253.)  Plaintiff reported that the pain was with any activities.  (*Id.*)  Dr. McBride noted that Plaintiff had been using a cane for ambulatory assistance.  (*Id.*)  Based on his evaluation, Dr. McBride opined that, with regard to his November 1999 work-related injury, Plaintiff was at MMI with a 7% PPI and that Plaintiff was capable of working but that he should avoid lifting over 35 pounds

and repetitive bending or stooping.  (R. 250.)  In June and July of 2001, Dr. McBride

reiterated his opinion that Plaintiff could return to light duty work status.  (R. 249-50.)

On June 14, 2001, Donald J. Tindall, M.D. performed a consultative evaluation.

(R. 186-87.)  Plaintiff reported that his low back pain had worsened since surgery and

that his pain gets worse with prolonged sitting, standing, walking, bending and twisting.

(R. 186.)  Plaintiff stated that he is unable to walk without an assistive device and that

he can walk about 100 feet with a cane.  (*Id.*)  Plaintiff reported that he was independent

of all activities of daily living.  (*Id.*)  Plaintiff could not get on the exam table so the

examination was carried out with him standing.  (R. 187.)  Dr. Tindall noted right and left

paraspinous muscle spasms at T10-L4 and diffuse lumbar tenderness.  (*Id.*)  Dr. Tindall

noted that he was unable to do a neurological exam of the lower extremities because

Plaintiff would not sit.  (*Id.*)  Dr. Tindall diagnosed Plaintiff with chronic low back pain

status post left L5-S1 hemilaminectomy and microdicectomy but noted that he did not

have a satisfactory explanation as to why Plaintiff's low back pain was so severe. (*Id.*)

Dr. Tindall was unable to make a determination regarding Plaintiff's functional capacity.

(*Id.*)

On June 18, 2001, Matthew D. Imfeld, M.D. performed a physical medicine

evaluation.  (R. 260-61.)  Plaintiff reported pain in his lower back with numbness and

tingling radiating into his legs and weakness all over.  (R. 261.)  Based on his

examination, Dr. Imfeld concluded that Plaintiff should be able to work within the

limitations set by Dr. McBride.  (R. 260.)   At Dr. Imfeld's recommendation, Plaintiff had

a MRI on June 29, 2001 (R. 259), that showed post-surgical changes at L5-S1, a tiny far

left lateral L4-L5 disc protrusion and facet arthropathy and ligamentous hypertrophy at

L4-L5 with stenosis of the left lateral recess.  (*Id.*)  An EMG of both lower limbs on July 30, 2001 was noted to be normal.  (R. 256-57.)  Dr. Imfeld recommended epidural injections. (R. 255.)

On September 28, 2001, Eugene A. Melvin, M.D. evaluated Plaintiff at The Pain Center of Central Florida.  (R. 264-66.) Plaintiff reported constant pain in his lower back and legs, with numbness, weakness, muscle spasm, stiffness and dizziness.  (R. 264.) On examination, Dr. Melvin noted tenderness to palpation at L3-4, L4-5, L5-S1, on both sides and bilateral posterior iliac crests in the distribution of the superior cluneal nerves. (R. 265.)   He further noted that range of motion was painful with right lateral flexion, left lateral flexion, lumbar extension and lumbar flexion.  (*Id.*)  Dr. Melvin found normal muscle strength and tone in the lower extremities without atrophy or abnormal movements but that Plaintiff was unable to heel and toe walk because of pain complaints.  (*Id.*)  Dr. Melvin noted decreased sensation to pinprick in the left L4 distribution, but otherwise, intact from L2-S1. (*Id.*)   Dr. Melvin's impression was superior cluneal neuralgia, bilateral, lumbar facet arthropathy L3-4, L4-5 and L5-S1 levels, radiculopathy left L4 levels, and post-operative spine surgery syndrome. (R. 266.) On October 19, 2001, Dr. Melvin administered bilateral facet blocks at L2-3, F3-4, F4-5, and L5-S1.  (R. 262-63.)

On November 27, 2001, Mary Beth Johnson, MSN, RN and Thomas E. Szymke, M.D. saw Plaintiff for an outpatient consultation evaluation.  (R. 271-73.)  On examination, Johnson noted that Plaintiff had "symptom magnification" with any type of range of motion of his back or lower extremities." (R. 272.)  Nurse Johnson noted that "the veracity of [Plaintiff's] subjective complaints is in question" and "[w]e fear that 85%

of his symptoms are due to his chronic narcotic use and 15% of his subjective complaints are secondary to the L5-S1 discectomy." (R. 273.)  Nurse Johnson recommended evaluation by a chemical dependency outpatient treatment center.  (*Id.*)  She noted that despite Plaintiff's representation that he had not had a drink in five years, a report by a private investigator showed that Plaintiff frequented saloons and package stores.  (*Id.*)

On January 17, 2002, Douglas Marshall, M.D. evaluated Plaintiff regarding complaints of chronic, constant pain in his lower back and legs with intermittent numbness and loss of sensation in his lower extremities.  (R. 275-78.)  The physical examination showed that Plaintiff was acutely uncomfortable, using a cane and crouched forward standing.  (R. 276.)  Dr. Marshall noted some paraspinal muscle spasms and that Plaintiff was diffusely tender to palpation throughout the back.   (*Id.*)  Dr. Marshall further noted that Plaintiff's motor strength was limited by pain and he had decreased sensory to light touch in the lower extremity.  (*Id.*)  Dr. Marshall's impression was chronic back pain, probable mild depression, sinus tachycardia, and inappropriate use of medications.  (R. 277.)

On April 16, 2002, Hugh Brown, Ph.D., performed a consultative psychological evaluation.  (R. 223-26.)  Plaintiff drove himself to the appointment.  (R. 223.)  He ambulated with a cane.  (*Id.*)  Dr. Brown administered the Wechsler Memory Scale III and Bendes Gestalt test.  (R. 224.)  Based on the test results and Plaintiff's history, Dr. Brown gave a guarded prognosis of Pain Disorder Associated With Low Back Injury, by history.  (*Id.*)  Dr. Brown stated that while Plaintiff's memory test scores were mostly in the low average range, they do not reflect any clinically significant memory deficit

because they are congruent with his IQ.  (*Id.*)  Dr. Brown further noted that Plaintiff's

receptive and expressive oral language skills were intact, that he was socially/

interpersonally appropriate during the evaluation, and that there was no evidence

suggesting that Plaintiff's ability to manage money and engage in financial transactions

had been significantly compromised.  (*Id.*)  Dr. Brown noted that Plaintiff had reported

that he was independent in the performance of all his ADL's and continued to operate

motor vehicles. (*Id.*)  Dr. Brown opined that Plaintiff "appears to be cognitively and

affectively intact," but that "[h]is pain could compromise his ability to understand, carry

out and remember instructions and to respond appropriately to supervision, coworkers,

and work pressures." (*Id.*)

On April 19, 2002, Bernadette Santos, M.D. performed a consultative evaluation.

(R. 196-98.)  Plaintiff reported that his back pain persisted after surgery and was

constant, sharp, achy and worse with all activities.  (R. 196.)  Plaintiff reported that he

constantly used a cane for ambulation, that his entire left foot was numb and that his

pain medication decreased his pain to a tolerable level.  (*Id.*)    Plaintiff reported that he

is independent with his activities of daily living, he drives and does some grocery

shopping.  (*Id.*)  Plaintiff further reported that he can sit for up to 45 minutes and stand

for 10-15 minutes. (*Id.*)  Dr. Santos noted that Plaintiff sat on the examination table erect

and got on and off of the table without difficulty.  (R. 197.) Plaintiff refused many parts of

the physical examination because of complaints of pain.  (*Id.*)  Dr. Santos noted mild

hypertrophy of the IP joints but no other joint deformity, effusion, warmth, or erythema in

his joints.  (*Id.*) Dr. Santos noted minimal paravertebral spasms in the lumbar region,

that Plaintiff's upper and lower extremity strength was 5/5 and pinprick and vibration

11

were normal and symmetric in the upper and lower extremities.  *(R. 197-98.)* Dr. Santos diagnosed Plaintiff with chronic low back pain with pain behavior and no evidence of radiculopathy or myelopathy and status post L5-S1 hemilaminectomy and microdiscectomy.  (R. 198.)  Dr. Santos opined that Plaitniff should be able to sit and walk at least six hours a day, lift and carry at least 25 pounds frequently and 50 pounds occasionally.  (*Id.*)  Dr. Santos found no manipulative, visual, environmental or workplace limitations.  (*Id.*)  Dr. Santos opined that Plaintiff's ability to deal with the pain would greatly limit his ability to work.  (*Id.*)

On September 19, 2003, Donald J. Tindall, M.D. performed a second consultative evaluation of Plaintiff.  (R. 294-96.)  Plaintiff reported constant low back pain radiating into the lower extremities that worsened with prolonged sitting, standing, walking, bending or twisting.  (R. 294.)  Dr. Tindall noted that Plaintiff walked with a cane but that he could walk short distances without it.  (*Id.*)  Based on his examination, Dr. Tindall found that Plaintiff has chronic low back pain with radiculopathy consistent with lumbar postlaminectomy syndrome.  (R. 296.)  Dr. Tindall noted that he was not sure about the exact cause of Plaintiff's neck pain but noted physical findings consistent with myofascial pain and soft tissue inflammation.  (*Id.*)  Dr. Tindall also noted that Plaintiff's ability to read and write is "significantly limited." (*Id.*)

There are four physical residual functional capacity ("RFC") assessments of record which were performed by non-examining state agency physicians. (R. 178-185,

188-95, 215-22, 241-48.)[25]  Based on the review of the medical records, the physicians

found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand

and/or walk for about six hours in an eight-hour workday, sit for about six hours in an

eight-hour workday and push and/or pull without limitation. (R. 179, 189, 242.) They

further found that Plaintiff should never climb ladders, ropes or scaffolds, but that he

could occasionally balance, stoop, kneel, crouch, and crawl (R. 180, 190)[26] and that he

should avoid even moderate exposure to hazards (i.e., machinery, heights.) (R. 192.)[27]

There are also two mental residual functional capacity ("RFC") assessments of

record which were performed by non-examining state agency clinical psychologists.

T. Wayne Conger, Ph.D., performed an assessment on April 29, 2002 (R. 201-22) and

James Mendelson, Ph.D., performed an assessment on April 14, 2002.  (R. 227-40.)

Based on their review of the medical records, both Conger and Mendelson found that

Plaintiff has no medically determinable mental impairment.  (R. 201, 257.

At the hearing on April 11, 2003, Plaintiff testified that he still has back and neck

pain.  He further testified that he could stand for ten to fifteen minutes before his lower

extremities would go numb.  (R. 41.)

---

[25] One assessment was performed by James J. Green, M.D., M.S. on July 20, 2001.  (R. 178-85.) One assessment was performed by David Grippe, M.D. on May 4, 2002. (R. 215-22.)  The other two assessments were performed by Jim Takach, M.D. -- one on October 1, 2001 (R. 188-95) and one on July 26, 2002.  (R. 241-48.)

[26] Takach (in his second assessment) and Grippe (R. 217) found that Plaintiff could occasionally climb ramp/stairs and ladder/rope/scaffolds. (R. 243.)

[27] Green found that Plaintiff should avoid concentrated exposure to hazards (R. 182), Takach found that Plaintiff should avoid even moderate exposure to hazards (R. 192, 245), and Grippe found no environmental limitations.  (R. 219.)

The ALJ determined that claimant suffers from chronic back syndrome with history of L5-S1 microdiscectomy and pain disorder.  (R. 17.)   While these impairments are severe, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (*Id.*)

The ALJ found that Plaintiff retains the physical RFC to stand, walk and sit six hours in an eight-hour workday and lift twenty pounds. (R. 18.)  The ALJ found that Plaintiff would need to avoid repetitive bending and stooping.  (*Id.*)  The ALJ noted that Social Security Rulings 83-14 and 85-15 provide that stooping and bending are required only occasionally in light exertional work.  (*Id.*)

The ALJ found that Plaintiff could not perform his past relevant work as a truck driver. (*Id.*)  The ALJ then used Rules 202.18/202.11 of the Medical-Vocational Guidelines (the "grids")[28] and found that Plaintiff was not disabled because Plaintiff could perform the demands of the full range of light work. (*Id.*)  The ALJ did not consult a vocational expert.

## IV. <u>DISCUSSION</u>

Plaintiff argues that the ALJ erred by relying solely on the grids without the testimony of a vocational expert.[29]  Because the ALJ found that Plaintiff could not return

---

[28] 20 CFR Pt. 404, Subpt. P. App.2 Rules 202.18 and 202.11.

[29] Plaintiff also contends that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain. Except to the extent discussed below regarding Plaintiff's use of a cane, the Court finds no error in the ALJ's evaluation of Plaintiff's subjective complaints of pain.  In addition, Plaintiff briefly argues that the ALJ failed to properly evaluate Plaintiff's RFC because he failed to include a "function by function" assessment and failed to discuss Plaintiff's ability to perform sustained work activities.  The Court likewise finds no error in this regard.

14

to his past relevant work, the burden of proof shifted to the Commissioner to establish that the claimant could perform other work that exists in the national economy.[30]  The burden of showing by substantial evidence that a person who can no longer perform his former job can engage in other substantial gainful activity is in almost all cases satisfied only through the use of vocational expert testimony.[31]  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.[32]

In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.[33]  This burden may sometimes be met through exclusive reliance on the "grids."[34]  However, exclusive reliance on the "grids" is not appropriate "*either* when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills."[35]  If either condition exists, the ALJ is required to consult a vocational expert.[36]

---

[30] See Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

[31] See id.

[32] See id.

[33] See Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

[34] Foote, 67 F.3d at 1558.

[35] See Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004)(quoting Francis v. Heckler, 749 F.2d 2565, 1566 (11th Cir. 1985.)

[36] See id.

Plaintiff argues that the ALJ was required to consult a vocational expert because the Plaintiff's nonexertional limitations (i.e., postural limitations, pain and use of a cane) significantly limit his basic work skills.[37]   The ALJ found that Plaintiff retained the RFC to perform light work but that he would need to avoid repetitive bending and stooping. (R. 21-22.) The ALJ then concluded that Plaintiff could perform the demands of the full range of light work. Using Rules 202.18/202.11 of the grids, the ALJ concluded that Plaintiff is not disabled.  (R. 19.)

The ALJ cited Social Security Rulings 83-14 and 85-15 which provide that stooping and bending are required only occasionally for light work.[38]  However, in addition to limitations on stooping and bending, there is evidence that Plaintiff had nonexertional limitations caused by his pain and that he used an assistive device for ambulation.  This combination of nonexertional limitations were not adequately addressed by the Social Security Rulings cited by the ALJ or the grid regulations.

With respect to Plaintiff's pain, there is evidence in the record that Plaintiff's pain resulted in nonexertional limitations.  First, Dr. Brown, who performed a consultative psychological evaluation on April 16, 2002 opined that Plaintiff's "pain could compromise his ability to understand, carry out and remember instructions and to respond appropriately to supervision, coworkers, and work pressures." (*Id.*)  Second, Dr. Santos, who performed a consultative evaluation on April 19, 2002, found that

---

[37] See Doc. 15 at 15-18.

[38] SSR 83-14 provides in pertinent part that "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally." Doc. 20, Exhibit 1.  SSR 85-15 provides that "[i]f a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." Id., Exhibit 2.

Plaintiff's mental capacity to deal with the pain "would greatly limit his ability to work." (R. 198.)  While the ALJ noted these findings when he reviewed the medical evidence, he did not consider this evidence when determining whether Plaintiff could perform the full range of light work.

As for Plaintiff's use of a cane, the ALJ found that Plaintiff "walks with a cane; however, this is not medically necessary."  (R. 17.)  The ALJ failed to articulate any evidentiary basis for this conclusion.  Defendant argues that the mere fact that Plaintiff took a cane to his appointments is not sufficient to establish a "need" for a cane.[39] However, the majority of doctors who treated or evaluated Plaintiff noted that he walked with a cane; and none of those doctors stated that the cane was not medically necessary.[40]  Accordingly, the ALJ's conclusion that a cane is not medically necessary is not supported by substantial evidence.  Additionally, the ALJ rejected as not credible Plaintiff's testimony that he must use a cane to walk.   (R. 18.)  However, the ALJ did not cite any record evidence to support this conclusion. Accordingly, for the reasons discussed above, the ALJ's decision to reject Plaintiff's testimony regarding his use of a cane was not supported by substantial evidence.

As a result of these conclusions regarding the cane, the ALJ did not consider what impact a cane would have on Plaintiff's abilities to perform the full range of light

---

[39] See Doc. 20, pages 8-9.

[40] For example, Dr. McBride noted that on physical examination Plaintiff "ambulates with an antalgic gait with the assistance of a walking cane." (R. 252.)  Dr. Brown noted that Plaintiff's "[g]ait was facilitated by use of a cane." (R. 223.)  Dr. Santos stated that Plaintiff could stand on his toes and heels "with the support of the cane" and that he could stand on each leg for at least 10 seconds "but he still has to support himself with the cane." (R. 197.)  Dr. Tindall noted that on physical examination Plaintiff held onto his cane or the counter top when standing and that he "is unable to stand or walk without holding onto something." (R. 187.)

work.  Indeed, Social Security Ruling 96-9P states that the use of a hand-held assistive device may impact a claimant's ability to perform even the minimal demands of sedentary work.[41]  The ALJ must consider the particular facts of the case -- i.e., whether the cane is needed all the time, periodically, or only in certain circumstances; whether it is needed for distance or certain types of terrain.[42]  Moreover, the ALJ must consider whether Plaintiff would be able to meet the lifting requirements since he would not have both hands free while using the cane.

Because the "grid" regulations did not adequately address Plaintiff's combined limitations (postural limitations, pain and use of an assistive device), the ALJ was required to obtain vocational expert testimony.   Accordingly, this matter is due to be remanded for the ALJ to reconsider, with vocational expert testimony, whether Plaintiff can perform other work which exists in the national economy.

## V. <u>CONCLUSION</u>

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the Administrative Law Judge to reconsider, with vocational expert testimony, whether Plaintiff can perform other work in the national economy, and to conduct any additional proceedings the Commissioner deems

---

[41] <u>See</u> Social Security Ruling 96-9P, 1996 WL 374185 (SSA 1996).

[42] <u>See</u> <u>id</u>.

appropriate. The Clerk is directed to enter final judgment consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on February 21, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel